Ready, special J.
delivered the opinion of the court.
The 14th article of the treaty concluded between Commissioners in behalf of the government of the United States, and Mingoes, chiefs, captains and warriors of the Choctaw nation, at Dancing Rabbit creek, on the 15th September, 1830, provides, that “each Choctaw head of a family, being desirous to remain and become a citizen of the States, shall be permitted to do so, by signifying his intention to the agent within six months from the ratification of this treaty; and he or she shall, thereupon, be entitled to a reservation of one section of six hundred and forty acres of land, to be bounded by sectional fines of survey; in filie manner, shall be entitled to one-half that quantity for each unmarried child which is living with him over ten years of age, and a quarter section to such child as may be under ten years of age, to adjoin the location of the pa *349 rent. If they reside upon said lands, intending to become citizens of the United States, for five years after the ratification of this treaty, in that case a grant in fee simple shall issue. Said reservation shall include the present improvement of the head of the family, or a portion of it. Persons who claim under this article shall not lose the privilege of a Choctaw citizen; but if they ever remove, are not to be entitled to any portion of the Choctaw annuity.”
It is stated in the bill, that under this article, a large number of Choctaws reported themselves to the agent, to be registered as reservees, which for some cause the agent neglected or refused to do; that he reported to the government but a small part of those who had, or supposed they had done what was necessary to entitle them to their reservations. That consequently the lands of many who intended to remain were sold by government.
Under this state of facts, that many of them made contracts with Gwin,-Fisher and others, some perhaps whose lands had been sold, and some probably who retained possession, but apprehended its loss, to interpose in their behalf, and secure to them their reservations of land. In- consideration of which services, the Indians contracted to pay them in most instances one-half the land secured, and in some instances a greater proportion; that under these contracts Gwin, Fisher and others associated with them, acquired a claim to a large quantity of land, amounting to many thousand acres. On the 7th day oí February, 1835, Charles Fisher executed a deed of conveyance to Thomas J. Porter for ten sections of land to which he had thus acquired a claim, reciting therein, “that whereas the said Fisher, Alexander F. Young, Daniel W. Wright, Grant Lincicum, and Wm. M. Gwin, of Mississippi, have heretofore, on certain conditions, purchased and contracted with Indians of the Choctaw nation in Alabama and Mississippi, for certain land they were entitled to under the provisions of the 14th article of Dancing Rabbit creek,” &c., “which said .lands, or the interest they are entitled to out of the same, are divided between the said Fisher, Gwin, Wright, Young and Lincicum, according to certain terms or ratios; and whereas the said *350 Thomas J. Porter, in consideration of his services already rendered and to be rendered in aiding and assisting the parties aforesaid in having their claims recognized by law, perfected to title, &c., is entitled to an interest therein. Therefore', in consideration of the premises and previous promises of some of the parties, the said Fisher has and by virtue of this agreement does agree to convey and confirm to said Thomas J. Porter, ten sections of land, of average quality, out of said claims, from and out of his the said Fisher’s own individual interest therein,” &c. “And the said Thomas J, Porter on his own part, undertakes to contribute in proportion to his interest thus conveyed by said Fisher, and to be conveyed by others of the parties or persons aforesaid, towai’d the satisfaction of any contributions in land or money which the parties may think necessary to undertake or provide, in order to secure the -final accomplishment of the business, and consummation of said claims to title.”
On the 10th day of November, 1835, Wm. M. Gwin executed to Thomas J. Porter, a deed of conveyance for fifteen sections of those lands, reciting “that whereas, heretofore, the said Wm. M. Gwin, Charles Fisher, Daniel W. Wright, Alexander F. Young and Grant Lincicum, contracted with certain Choctaw Indians for claims of theirs, to land in the late Choctaw country, arising under the 14th article of the late Choctaw treaty and instructions from the department, which have in part been located or reserved, and which said contract, or the interest of the parties therein, have been divided between them according to a certain ratio, by contract between themselves. And whereas the said Thos. J. Porter, for services rendered and to be rendered in assisting the claimants before the government to have their claims recognized and perfected to title, &c., was entitled to a interest therein; and whereas; by agreement, the interest of the said Thomas J. Porter, was to be made up to him, by each of the parties conveying to him a certain number of sections. Therefore, in consideration of the premises, and towards the satisfaction of said Porter’s claim on said Wm. M. Gwin, the said Wm. M. Gwin has, and by virtue of this instrument does convey to the said Thomas J. Porter fifteen sections *351 of land of said contract, to be of average value, and to betaken from the undivided interest of the said Gwin,” &c.
On the 17th day of December, 1835, Thomas Maney, the complainant, purchased of Thomas J. Porter, the defendant, at the price of $10,000, an undivided half of the twenty-five sections of land to which Porter had acquired a claim by the conveyance from Fisher and Gwin, being a part of the lands commonly known as “Choctaw floats,” and executed his two notes to Porter for $5000 each, for the purchase money, payable in one and two years. Defendant executed to complainant a deed of conveyance for .an undivided half of the twenty-five sections of land sold to him as aforesaid, which is in the words and figures following, to wit:
“This article of contract and sale between Thomas J. Porter, of Columbia, Tenn., of the first part, and Thomas Maney, of Franklin, Tenn., of the second part, witnesseth; that whereas, by contract, dated 7th February, 1835, Charles Fisher, of N. Carolina, has conveyed to the said Thomas J. Porter, ten sections of land, and Wm. M. Gwin by contract, dated 10th November, 1835, has conveyed to the said Thomas J. Porter fifteen sections of land, malting twenty-five sections, to come out of a contract or contracts said Fisher and Gwin have made with certain Choctaw Indians for their claims to lands under the 14th article of the late Choctaw treaty; (a copy of said contracts of Fisher and Gwin to Porter, being furnished to said Maney,) and whereas, by a contract this day made between said Porter and Maney, the said Porter has, for a valuable consideration, sold to said Maney an equal and undivided one-half of said contract of twenty-five sections, reserving and not selling in this contract with said Maney, the locations spoken of in said contracts of Fisher and Gwin, as being located in township 24, range 8, west of section 12. Therefore, for the consideration aforesaid, the said Porter has, and by virtue of this instrument, does sell and convey to said Maney one-half of said twenty-five sections, or an undivided interest of one-half in the whole of said twenty-five sections, by quit claim, the said Porter not guaranteeing, or to be bound by any manner of recourse in law or- equity, but for the consideration aforesaid, quit claims *352 to said Maney the interest aforesaid, with all the advantages arising under the same from the said Fisher and Gwin. Witness my hand and seal.
THOMAS J. PORTER, [Seal.]”
Shortly after complainant returned from Mississippi to his residence in Franklin, Term,, he became dissatisfied with his purchase, and meeting with the defendant in Franklin, in March 1836, proposed a recision of the contract of purchase, which defendant refused. After frequent conversations between, the parties on the subject, and urgent solicitations -by complainant for a recision of the contract, defendant on the 4th of October, 1836, agreed to take back one-half of the interest in the twenty-five sections of land which he had sold and conveyed to complainant, give up his notes for the $10,000, and took his note for $5000, payable'in bank at eight months; which agreement was carried into effect by complainant executing his note for $5000, re-assigning to defendant one-half of the interest in said twenty-five sections of land, for which he held defendant’s conveyance, and defendant delivering to him his notes for $10,000.
The $5000 note thus executed by Maney, not being paid at maturity, Porter sued and obtained a judgment at law thereon, against Maney. The bill in this case was- filed to enjoin the collection of the judgment, and for a recision of the contract of purchase.
The bill proceeds on the ground of fraudulent representations, by Porter, and his fraudulent concealment of facts within his knowledge, which were unknown to Maney; but the main' point and stress of the bill, seems to be an alledged verbal agreement by Porter at the interview with Maney in March 1836, and its renewal at the time the reassignment and new note were executed, that in the event of the appointment of a commission by Congress, to sit upon the Choctaw reservation claims, he would take back those sold to Maney, which he has since refused to do, although' a commission has been appointed by Congress.
The answer denies that any such agreement or promise was ever made at any time; and there is no proof sustaining the charge. So far then, as relief is sought upon this ground, if *353 the allegation were admitted or proved to be true, whether it would authorize the interposition of a court of equity, it would be useless to discuss,
The other allegations in the bill, which it is deemed necessary to notice, are,
1. That Porter represented these reservation claims, at least the greater part of them, as just and fair claims, which would in all probability be recognised by Government; and if they should fail in Congress, could and would b.e enforced in the Federal court. Porter admits he held such conversation with complainant, but insists it was a mere matter of opinion on a subject about which complainant was as competent to judge as he was, being informed that the claims arose under the 14th article of the treaty of Dancing Rabbit creek; and being also informed, as he doubtless was, of the facts connected with the application by the Indians, and their failure to get themselves registered as reservees.
This statement of Porter’s cannot be regarded otherwise, than as an expression of an opinion. It is not charged nor does it appear that any statement was made by Porter, as a matter of fact, on which this opinion was predicated, which was not true: nor was there any thing in the relation subsisting between Porter and Maney, from which it can be said there was a peculiar confidence reposed in the opinion expressed. There is, furthermore, nothing to show that this opinion was not expressed in good faith. Then, although the.opinion may have been erroneous, it can afford no grounds for the interference of a court of equity.
2. It is alledged Porter stated “his claims to the twenty five sections, had priority overall other sales of Fisher and Gwin, and if, of all the claims purchased by them, there were but the twenty five sections saved, he would be entitled to them;” and this statement it is said is untrue.. Porter in his answer denies having made it, and there is no proof of it; but if' he had said so it might be well answered again, it was but the mere expression of an opinion, founded on the construction of the deeds from Fisher and Gwin to Porter, which were submitted to Maney’s inspection, as the deed itself, from Porter to him shows. He is *354 a man of intelligence and a lawyer, and too competent to form an opinion, for himself, as to the proper construction of the deeds, to be misled by Porter.
3. That Porter represented to complainant at the time he made the purchase, “the claims were certainly good, and that there was every probability of their speedy adjustment by the government; that a bill for that purpose was before the then last session of Congress, passed the Senate, and would have passed the House of Representatives, but for the obstinacy of one member, who objected to the dispensing with the rules of the house; if it had been reached, it would certainly have passed. That the bill stood first or second on the calendar, and would no doubt, be passed into a law at the next session, and that it was all the claimants could desire.
It is said, that Maney was misled by these statements. Porter admits that he made them sometime after the sale to Maney, and says they were true — but denies having made them at the time the contract was entered into. Whether true or false, there is no proof, they were made at or previous to the contract, and it cannot, therefore, be said Maney was misled by them.
4. It is alledged Porter represented the claims were well located, the lands valuable, and worth on an average ten dollars per acre.
5. That some of the distinguished men in Congress were in favor of them, that Mr. Clay, Mr. Webster, and Judge White and others, whose names complainant does not remember, were in favor of them — when in fact, they were opposed to them, and made speeches against them.
6. That he had been offered 12,000 dollars for the interest he was proposing to sell to complainant, by Col. Richardson of Tchula, and could then get it, but that he wanted complainant to make something, and was therefore induced to make him the offer he had at $10,000; and stated if the claim succeeded, he had made enough any way, and that he did not intend to sell the other half;, that he should attend to the claims throughout, and if Congress made pecuniary satisfaction to the Indians, there would be no difficulty in getting them to comply with *355 their contracts with Gwin and Fisher, without whose assistance they could not have obtained their rights. And confiding in all these statements and promises, and in Porter’s ability to manage the claims, he made the purchase: but the statements were untrue and the promises not complied with. All these allegations are denied by Porter, except that one, in regard to getting the Indians to comply with their contract with Gwin and Fisher, if Congress made them pecuniary satisfaction, and there is no proof sustaining them. The deposition of Col. Richardson has been taken to sustain the allegation about the offer it is said Porter pretended he had made. He states that he had frequent conversations with Porter, in the latter part of 1835, about his claim to these twenty five sections, and Porter appeared anxious to sell a part or all of them, and said he had been offered $12,000 or more for one half — but witness never made him any specific offer. This testimony certainly does not sustain the charge in the bill, but rather supports the answer, which denies defendant ever made the statement charged, in regard to the offer of Col. Richardson.
There is another material allegation in the bill which demands a special notice. It is, in substance, that the defendant was a partner in the original purchase from the Indians, or that Porter stated to complainant in the language of the bill, “that he was originally entitled to a certain interest in the purchase, and concluded to take the twenty-five sections, as being more secure than a general interest in the whole.”
Porter is also required to state in his answer what individual Indians sold their claims to Fisher & Gwin, or either of them, and what are the evidences in existence of the contract or assignment between each Indian and Gwin & Fisher, whereby they became entitled to the claims of said Indians.
Porter denies that he was a partner in the original purchase from the Indians, or that he informed Maney that he was originally entitled to a certain interest in the purchase.
He answers, that he is informed and believes Gwin & Fisher had made contracts with many of the Indians, as charged in the bill, but that he never saw any of the contracts — is not familiar with them, and has no other knowledge or information *356 than as stated, and with which complainant is as fully acquainted as himself, that he made his purchase of Gwin & Fisher upon their representations of the general nature of their contracts, which were numerous; that he so informed complainant, who relied, as he had done, upon the representations so made by Gwin & Fisher,without looking into the particular contracts, which would have required much time and labor.
The answer, as to all these particulars, stands uncontradicted by proof. The general remark may here, also, be made, that every material allegation in the bill, intended to impeach the defendant with fraudulent representations and concealments— to charge upon him a knowledge of defects in the title of Gwin & Fisher, which were unknown to complainant, is denied in the answer and not sustained by proof. It is, therefore, most certain that a court of equity can afford no relief to complainant unless there is something in the nature and subject matter of the contract which renders it void. Various points have been presented by complainant’s counsel which have been argued with great zeal and ability, while they have been ably combatted on the other side.
It is said the pretended purchase of Fisher, Gwin, and others from the Indians was void, being in contravention of the 12th section of the act of Congress, of 30th March, 1802, “to regulate trade and intercourse with the Indians, and to preserve peace on the frontiers.” That when the Indians sold to Gwin, Fisher & Co., they had not even an inchoate right to the lands which it is pretended they sold; that the contract with the Indians, with which it is said Porter is connected, is contrary to public - policy, and therefore void; that no contract for the sale of land, or any interest in land is valid, according to the laws of Mississippi, unless the same is reduced to writing and signed by the party to be charged therewith, or by some agent thereunto lawfully authorized; that Porter has obtained an undue legal advantage over Maney, which it is unconscien-tious for him to insist upon; that the contract was executed under the belief of both parties, that there was in existence, some land, or rights to land, about which they were contracting, when there was none — and the contract should, therefore, *357 be rescinded on the ground of mutual mistake; that this was a mere bubble, a fictitious company got up for the purpose of enriching the proprietors at the expense oí'- sanguine and ignorant adventurers, holding out delusive hopes of rapid gain — and amounting to actual fraud. The first three of these positions are predicated on the assumption that Porter was a party to the contracts with the Indians, or stands in the attitude of a party. If this be true, it must have an important bearing on the case. Then, was he a party?
It has already been shown, he denies in his answer, that he had any connection with the original contracts, and his answer has not been disproved. On the contrary, it is sustained by the deeds from Fisher and Gwin, showing that he .claims immediately under them — and the deeds both recite that Fisher, Gwin, Young, Wright and Lincicum had, “heretofore” contracted with the Indians for certain land, to which they were entitled, and a portion of which was by said deeds conveyed to Porter. The letter of Gwin to Porter, which is filed as evidence in the cause, also sustains the answer: he says, “You have fully performed the service for which I agreed to give you an interest in the Choctaw claims, under the 4th article of the treaty of Dancing Rabbit creek.” If Gwin could confer an interest in those claims, he must have already acquired it himself, and Porter taking an interest at his hands is strong proof that he had none before. Then, whether Fisher & Gwin had acquired any right to those lands or not, what was Porter’s position in regard to them?
It cannot be denied, if Fisher & Gwin had no right, they could confer none on Porter. But whether they had a valid right, or their claim was void as against a positive statute, or against public policy, or because those from whom they claimed had no right and title to convey, or because their claim depended upon a parol agreement, which is invalid to confer a title, according to the laws of Mississippi, Porter had an assurance of title from them-r-whether that assurance was worthless or not may be immaterial. Did Porter believe he was acquiring something real, a substantive right? He took the conveyances from Fisher & Gwin, confiding in their representa *358 tions that they had a right, acquired by contract with the Choctaw Indians, whose rights arose under the 14th article of the treaty of Dancing Rabbit creek, but from what individual Choctaws they purchased, where their particular place of residence was, or whether they had written or mere verbal contracts, he says he was not informed. His statement being responsive to the bill, and not being disproved, we are to take it as true. Then did not Maney purchase with all the information in regard to the title which he had? The deeds from Fisher & Gwin, which were submitted to Maney, of themselves impart all this information. There is no evidence that any facts had come to the knowledge of Porter after his purchase to notify him his title was invalid, or to create doubts in regard to it, which were withheld from Maney. There is no evidence that he made any false representations of facts, as having transpired or come to his knowledge after his purchase. It is yet to be seen whether he was incorrect in any opinion he expressed.
So far as developments have since been made from the action of Congress in the creation of a commission, and the action of the commissioner, they have been favorable and tend to sustain his opinions. Porter and Maney thus stand upon the same footing. The latter doubtless believed he was purchasing a valid claim, or he would not have contracted to pay the consideration; and can it be said, the former did not equally believe, he too was purchasing a valid claim? He, too, was stipulating to pay a valuable consideration — true, it was not a money consideration, but services rendered and to be rendered, which required time and skill, and it may be said the expenditure of money also, a species of consideration often more valuable to all parties, than an entire money consideration.
Then, if Maney had sold his claim, stipulating that he should not be responsible for the title, and making such representations only, as were made to him, believing them to be true, could he be held responsible upon a failure of title? The affirmative could, not be successfully maintained, and if it has been shown that he and Porter stand on a similar footing, neither can it be held that Porter is responsible for a failure of title.
But it has been contended with much ingenuity, under the *359 fourth position as above stated, that in as much as there is no proof of any contract between the Indians and Fisher and Gwin, and if there was a contract, it is not proved whether it was verbal or written; in the presence of witnesses or secret; whether it was with Indians who removed to the Choctaw country, west of the Mississippi, or those who remained in Mississippi and Alabama; and in as much as it is said, if such proof exists, it is within the knowledge of the defendant and not of the complainant, their situations being very different, and not having-equal means of information, the former being the confidential agent and partner of Fisher and Gwin, and having received an assignment of part of their interest, in consideration of services “heretofore and hereafter” to be performed, in attending to the claims and procuring a title, that he must necessarily, from his confidential relation with Fisher and Gwin, have known all their secrets, the nature of their conveyances and agreements, if they have any, with whom they were made, &c.; that having been required to disclose these matters, which he has failed to do, it follows, when Porter represented to Maney, that Fisher and Gwin had made contracts with the Indians, that they had assigned parts of their contracts to him, &c., he was guilty of fraud and misrepresentation, for which the contract with Maney should be rescinded. In support of this position the case of Terry vs. Buck et al, 1 Green’s Ch. Rep. 366, has been cited. That was a case where Buck had purchased from Terry a house and lot in Newark, N. J., at the sum of 19,000, and had paid $5,100 in the stock of a company in New York, called the “United States Foreign and Domestic Exchange Company,” ofwhich Buck was the Cashier. The stock was entirely worthless, and never had any value. The institution was gotten up as a fraud, and was so considered by all. It was a mere bubble. Buck had declined giving Terry any information or opinion about the value of the stock, but told him he must enquire for himself, and satisfy himself of its value, and referred him to the President. The contract for the sale of the house and lot being executed, Terry filed his bill, to set aside and declare null and void his deed conveying the property, for fraud and misrepresentation in regard to said stock. *360 B uclc omitted answering the charge in the bill, that the stock was “of little or no value,” and upon exceptions taken to his answer, for this cause and sustained, he put in a further answer, which was evasive. “He answered literally, that he did not know at the time of the negotiation, or at any other time, that said stock was of little or no value.” That he had understood from the president, that the company had mortgages to secure stock subscribed to an amount between two and four hundred thousand dollars, some of which he had seen; and that from such information, he believed said stock tobe “of value,” but of the price or more certain amount of the value of said stock, or of said mortgages, he professes to have no other knowledge or information. That he never knew or heard of the price of any of the stock, except that sold to complainant; “nor does he know any thing further of the value of the stock. The chancellor asks, “What kind of answer is that to this important enquiry? The defendant by the very mode of answering must satisfy every mind that the charge against this stock was true. That it was a mere bubble.”
But the defence was not rested so much upon the stock being of any value, as upon the fact, that the complainant had a full and fair opportunity to enquire into the character of the institution for himself, and particularly, that the defendant over and over again declined to express any opinion himself as to its value. The chancellor in relation to this point says, “There is a feature in this case, which has a material bearing with me. The defendant Buck, at the time of the negotiation was the cash-' ier of this company, and as such, had, or should have had, free access to all the papers, and full knowledge of its condition, and if any thing was concealed from him, that fact was certain evidence that all was not right. The fact that Buck, cashier as he was, declined to give the complainant any information respecting the company or its stock, and now predicating his defence mainly on that, furnishes, in my opinion, strong evidence against him. A cashier of a company, and know nothing of its affairs! and that too when other people knew it to be worthless. I cannot suppose such a state of things, and if it was so, it was notice to him that the institution, in the language of one of the witnesses, *361 “had no bottom.” It is this very holding back of information' which, in this case, created all the difficulty.”
It was -upon the svgypressio veri, the chancellor predicated his decision rescinding the contract, and doubtless he decided correctly. It was most manifest from the defendant’s evasion in his answer, from his unwillingness and refusal to give any information about the character or value of the stock in connection with the fact that he was cashier of the company, that he knew the stock was worthless. The withholding that important information was a fraud upon the vendor of the property.
What analogy does the case referred to, bear to the case under consideration? Here Porter was the agent of Fisher and Gwin. -And for what purpose? To get the government to perfect the titles to these lands, or to make compensation for them in money. In whom to perfect the titles? for whom to procure a compensation in money? In and for the Indians surely. The very terms of the contracts with the Indians, as stated in the bill, and as admitted in the answer,- show that Fisher, Gwin and others, undertook to secure to the Indians their reservations, in consideration of which services, the Indians were to give them such a portion of the land secured. Fisher and Gwin employed Porter as their agent, to render this service in their stead. What information was it necessary for Porter' to possess to effect this object? Was it necessary for Fisher and Gwin to tell him that one Indian was to give them so much in money, and another one so much in land, and another a different quantity of land, that one had secured them by bond, another had executed a conveyance by deed for the land, and with a third they had a mere parol agreement, and so on throughout the whole list? By no means. It would only be necessary for Porter to be informed that many of the Choctaw Indians, residing in Mississippi and Alabama, had, within the time specified by the treaty, presented thernselves to the agent of the government and offered to enroll themselves as reservees, that the agent, for some cause, refused their application, and that the enrollment was lost, and to be furnished with such evidence as would satisfy Congress that injustice had been done them, so as to induce the enactment of a law to redress the grievances of all those who *362 brought themselves within its provisions. The Indians’ rights secured, Fisher and Gwin would, of course, look to them for a fulfilment of their contracts. Then, if it be true, that Fisher and Gwin had only parol contracts with the Indians, there was nothing in the employment of Porter as agent, which would bring home to him a knowledge of that fact.
But it is said, in addition to his confidential relation to Gwin and Fisher as agent, &c. they assigned to him a part of then-interest in consideration of his services, “heretofore and hereafter” to be performed, in attending to the claims and procuring a title; and, therefore, he must have known the nature of their contracts with the Indians. As well might it be said, that Ma-ney knew the nature of Fisher’s and Gwin’s contracts, because he took an assignment of land claims, depending on those contracts. Yet one of the main pillars on which his bill rests is, that he did not know the nature of those contracts. And, it may be added, there is no allegation in the bill, much less any evidence in the cause, that he ever enquired to know any thing of them. Is it more extraordinary that Porter should take an assignment from Fisher and Gwin without enquiring into the character of their contracts with the Indians, than that Maney should take an assignment of a claim depending on the same contracts for its validity, without investigating them; and that, top, when he was contracting with his vendor, that he was to have no recourse on him in law or equity, if his title proved invalid?
Then we come to the conclusion, that there was nothing in the employment of Porter, or in the relation he sustained to Fisher and Gwin, which would necessarily notify him of the 'character of their contracts with the Indians, as in the case of the Cashier of the Stock Company, in New York. There is this further difference: Buck, the cashier, refused to give any information, or express any opinion as to the value of the stock. Porter communicated freely, answered all the enquiries made of him, and, for aught we can see, has answered as far as he had any knowledge, without evasion.
It cannot, therefore, be held, that Porter has been guilty of a suppressio veri, because he has failed to produce, or to explain *363 the character of contracts, which, he answers, he never saw, and of which he knows nothing, except that Fisher and Gwin told him they had contracts with the Indians for reservation claims, even though the fact may be, that these contracts are void for uncertainty, or for want of the necessary formalities and solemnities.
This is a bill to rescind a contract execu ted, and presents, therefore, a very different question from that, where a party calls upon the court to compel a specific performance. Those cases always rest in sound discretion, and the contract will be enforced, or not, as shall appear most agreeable to justice and equity. But applications to rescind, must abide the result, one way or the other, of the stern proof of fraud, for it will never be implied. In the absence of all proof of the suggestio falsi or sivppressio veri, these parties must stand upon their contract, notwithstanding the allegation by complainant, that he “has never yet received any thing, either in land or money from those claims, and is apprehensive he never shall,” (the former part of which allegation, to wit, that he has never yet received any thing, is admitted in the answer); and, notwithstanding also, his fears “even if the claims should be finally allowed to the Indians, 'and secured to the purchasers from them, he would be compelled, before he could obtain possession of the land, to institute suits in Mississippi, the vexation and expense of which would probably equal or exceed the prospect of final success.” Suppose1 all these fears should be, or were even now realised, still it would afford no grounds for relief. He took upon himself the risk. He took a conveyance, without any covenants of warranty. Indeed he expressly contracted with Porter, that he was not to guaranty the title, and was not “to be bound by any manner of recourse in law or equity.” And, without this express contract, the mere conveyance without covenants of warranty, would subject complainant to the loss by defect of title. In the case of Abbot vs. Allen, 2d John. Ch. Rep. 519. Chancellor Kent sayS: “If there be no fraud, and no covenants taken to secure the title, the purchaser has no remedy for his money, even on a failure of title. Thisisthe settled ruleat law, (Frost vs. Raymond, 2 Caines, 188,) *364 and I apprehend the same rule prevails in equity.” In Chesterman vs. Gardner, 5 John. C. R. 29, speaking of the plaintiff’s remedy, the chancellor says: “Nor can he have any remedy in this court, on the mere ground of a failure of title, if he has taken no covenants to secure the title, and there be no fraud in the case. The cases to this point were referred to in Abbott vs. Allen, 2 John. Ch. Rep. 522-23, and they appear to be very clear and explicit.” In Frost vs. Raymond, 2 Caines, 191, Kent says: “Whatever maybe our opinions on the point, as an abstract question, or whatever may be the decisions of the civil law, or the feudal and municipal laws of other countries, we must decide this question by the common law of England. It was decided in the case of Sexias Sf Wood, that upon a sale of goods, without warranty, and without deceit, the purchaser took the soundness and quality of them at his peril.
We think it is evident that caveat emjptor has always been recognised in our law books, as a fixed maxim, applicable equally to the transfer of lands and chattels- In Wallace vs. Barlow’s Adm’r., 3 Bibb, 171, the court says: “By the stipulations contained in the agreement upon which this action is brought, the plaintiffs and Barlow seem to have considered the plaintiffs’ title doubtful. The plaintiffs were not to warrant the title; they sold their claim only. The plaintiffs’ claim, and not their covenant for a good title, was the consideration of the covenant by Barlqw. It is obvious from the agreement that Barlow purchased the benefit of the plaintiff’s claim only, that it was a chanceing bargain. To an action brought on such a contract, it is evidently inadmissible for the defendants by plea to aver a defect of title in the plaintiffs, unless fraud is charged to have been committed in making the contract.”
In Sugden on Vendors, 558, ninth edition, a case is mentioned where A. bought an estate, to one moiety of which there was a clear defect of title, which his counsel had overlooked, and he was afterwards evicted; he filed a bill asserting his claim to be repaid a moiety of the purchase money, although the covenants for title did not extend to the eviction, but the bill was *365 dismissed.” See, also, the case of Urmston vs. Pate, cited in Sugden 559, and 4th Cruise’s Digest, 90.
It is useless to multiply authorities to fortify the position that Porter is not liable for a defect of title, there being no proof of fraud, although the title of Fisher and Gwin, under whom he claimed, may be absolutely void.
The fifth and sixth positions of complainant’s counsel, as above stated, are fully met by the doctrine of caveat em/ptor. There is not an instance where land is sold without covenants of warranty, or, where, as in this case, the parties stipulate, that the vendor is in no court to be responsible for the title, and it turns out, that there is a defect of title, in which it may not be said the vendor has obtained a legal advantage over the vendee. Nor is there an instance in which a party sells land believing that he has a valid claim, and it turns out that he was mistaken, that he had no right, in which it may not be said, the parties contracted under a mutual mistake.
If a court of equity can interfere in such cases, and relieve the purchaser who has not taken the precaution to secure himself by proper covenants of warranty, the doctrine of caveat evwptor, must cease to be recognised as a part of our system of laws. And in this particular case, if relief can be afforded complainant on such grounds, the solemn contract of the parties, voluntarily, and, as far as can be seen, fairly entered into, must be set at naught.
Lastly. It is said, these claims are a mere bubble; that a fictitious company was gotten up, &c., holding out delusive hopes of rapid gain, and amounting to actual fraud. What is a bubble? It is a fraudulent scheme, known to the proprietors to have no foundation in reality, but holding out great prospects of gain, to induce the unwary-to join in the scheme by contri'buting their money.
Then had these Indian claims no foundation in reality? Did they not fairly arise under the 14th article of the treaty? Contracts were made, between Fisher, Gwin and others, and the Indians, to enforce their claims. Can. we say, those contracts were not made bona fide? Had not the Indians the right to employ counsel, men of superior intelligence to themselves, to aid *366 them, in sustaining their rights? To hold they had not, would in effect, be saying, they were the lawful prey of artful and rapacious white men. If they have a right to call to their aid the superior intelligence of white men, have they not the same right to contract to pay them for their services? Whether they had a complete title to the property they contracted to pay, and could convey a title, is not deemed material. If they believed they had the right to make compensation out of the lands they were seeking to secure, and Fisher, Gwin and others took conveyances for the lands in good faith, believing they were acquiring-such title as the government of the United States might guaranty to the Indians, it cannot be said they were engaged in a fraudulent scheme, for the purpose of alluring the unwary. That they engaged Porter to attend at Congress, and urge the recognition of thbse claims, for which they contracted to pay him in a portion of the same lands to which they had acquired a claim by contract with the Indians, certainly cannot give the whole affair the character of a bubble.
The view taken of this case, renders it unnecessary to deliver an opinion on the question of confirmation which has been argued, growing out of the execution of the new note of $5000, and taking up those for $10,000.
If we had held the original contract between the parties, void, we should have no hesitation in deciding, that the compromise and execution of the new note, was not a confirmation of the original void contract.
We are unable on any ground to sustain complainant’s bill, and the decree of the chancellor must, therefore, be affirmed.